**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | **No. 25 CR 367** |
| **v.** | ) | |
| | ) | **Judge Rebecca Pallmeyer** |
| **MELVIN DOYLE** | ) | |

## MOTION TO DISMISS

Melvin Doyle is charged in three counts of the indictment with unlawfully possessing a firearm after sustaining a felony conviction, in violation of 18 U.S.C. § 922(g)(1). Both facially and as applied to Mr. Doyle, § 922(g)(1) is unconstitutional because Section 922(g)(1) is not consistent with the nation's historical tradition of gun regulation. The Court should dismiss these counts of the indictment with prejudice.

## BACKGROUND

The Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022) held that when the "Second Amendment's plain text covers an individual's conduct," to justify a regulation of that conduct the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." An extensive body of caselaw from the Courts of Appeals and district courts has developed applying *Bruen* to various gun regulations, including § 922(g)(1). *See, e.g., Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023); *United States v. Prince*, --- F. Supp. 3d ---, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023).[1]

[1] *Prince* is currently on appeal (No. 23-3155). The appeal was argued on December 11, 2024, and is pending decision.

On April 12, 2024, the Seventh Circuit issued its decision in *United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024), in which it found that the defendant did not enjoy the Second Amendment rights of "law-abiding, responsible citizens" considering, among other things, his 22 felony convictions and his status as a parolee. Subsequently, the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680, 144 S.Ct. 1889 (2024), which clarified the standard set forth in *Bruen* in the context of a prosecution under 18 U.S.C. §922(g)(8).

On July 16, 2025, the government indicted Mr. Doyle with one count of unlawful sale of a firearm, in violation of 18 U.S.C. §922(a)(1)(A), and three counts of unlawfully possessing a firearm as a felon in violation of 18 U.S.C. §922(g). Dkt. 14. As set forth in the Pretrial Report, Mr. Doyle has sustained two prior felony drug possession convictions, for which he received terms of three- and five-years' custody, respectively, and a 1995 conviction for attempted murder. Dkt. 12. He has also sustained convictions for misdemeanor and ordinance offenses. *Id.* Mr. Doyle now moves to dismiss the counts of the indictment that charge him with being a felon in possession of a firearm.

## ARGUMENT

Under *Bruen* and *Rahimi*, § 922(g)(1) is unconstitutional facially and as applied to Mr. Doyle, notwithstanding *Gay*. And as explained below, *Gay* does not survive *Rahimi*.

### I. Relevant Legal Background in the Supreme Court and Seventh Circuit.

#### A. *Bruen* and the Seventh Circuit's subsequent decision in *Gay*

In *Bruen*, the Supreme Court rejected the "intermediate scrutiny" framework that many appellate courts, including the Seventh Circuit, had previously applied to Second Amendment challenges. 597 U.S. at 19 (rejecting the two-step test set out in *Kanter v. Barr*,

919 F.3d 437, 441 (7th Cir. 2019) because it "involved one step too many"). In its place, the *Bruen* Court explained that

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 51 n.10 (1961)). Nationwide, numerous challenges to the subsections of 18 U.S.C. §922 followed.

Subsequently, the Seventh Circuit held in *Gay* that the defendant, a felon, did not have a constitutional right to possess firearms at the first step of the *Bruen* analysis. 98 F.4th at 847. The court stated that *Gay's* argument was "hard to square" with *Heller's* language that that opinion should not be read "to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *Id*. at 846. The court assumed that some as-applied challenges to § 922(g)(1) were permissible but found that *Gay* was "not a 'law-abiding, responsible' person who has a constitutional right to possess firearms" due to his 22 felony convictions and status as a parolee. *Id*. at 846–47. Thus, *Gay's* challenge to § 922(g)(1) failed. *Id*.

Courts in this district have interpreted *Gay* in various ways. *See, e.g., United States v. Mintz*, No. 22-cr-00438, 2024 WL 3177910, at *3 (N.D. Ill. June 26, 2024) (Coleman, J.) (stating that *Gay* concluded the defendant was "not a 'law-abiding, responsible' person who has a constitutional right to possess firearms given his criminal history and the fact he violated the statute while on parole."); *United States v. Head*, No. 23 CR 00450-1, 2024 WL 2292236, at *3 (N.D. Ill. May 21, 2024) (Maldonado, J.) (*Gay* "concluded that, given his

criminal history and the fact he violated the statute while on parole, Gay was not a 'law-abiding, responsible' person who has a constitutional right to possess firearms[.]"); *United States v. McIntosh*, No. 21-CR-188, 2024 WL 2018277, at *1 (N.D. Ill. May 6, 2024) (Blakey, J.) (*Gay* "forecloses any facial invalidation of § 922(g)(1) under the Second Amendment"); *United States v. Hurnes*, No. 1:22-CR-00057, 2024 WL 2701099, at *5 (N.D. Ill. May 24, 2024) (Chang, J.) ("*Gay's* direct holding was that parolees have a reduced right to possess firearms").

### B. The Supreme Court's decision in *Rahimi*

In *Rahimi*, decided after the *Gay* opinion was issued, the Supreme Court addressed a narrow challenge to § 922(g)(8)(C)(i), which prohibits an individual subject to a domestic violence restraining order from possessing a firearm if the restraining order includes a finding that the person is a credible threat to the physical safety of another. 144 S.Ct. at 1896–97. The Court found § 922(g)(8) constitutional in part because its restriction is "temporary[,]" *id*. at 1902, and "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another[.]" *Id*. at 1901. The Court clarified the *Bruen* standard and explained that it was not "meant to suggest a law trapped in amber" and "permits more than just those regulations identical to ones that could be found in 1791." *Id*. at 1897. But the government must show the challenged law is "consistent with the principles that underpin our regulatory tradition" and is "relevantly similar to laws that our tradition is understood to permit[.]" *Id*. at 1898.

The Court also emphasized that "[w]hy and how the regulation burdens the right are central to this inquiry." *Id*. The "why" goes to a law's purpose in achieving a regulatory goal. *Id*.; *Bruen*, 597 U.S. at 29. And the "how" goes to the weight of the law's burden. That

burden includes the kind of showing needed to trigger disarmament, the temporary nature of that disarmament, and the consequences that flow from it. *Rahimi*, 144 S.Ct. at 1901–02. A modern law must meet both prongs of the test. *Id*.; *see also Bruen*, 597 U.S. at 29. A law that has a distinct purpose is unconstitutional even if its burden is minor. *Id*. So too is one that applies "for a permissible reason … [but] does so to an extent beyond what was done at the founding." *Rahimi*, 144 S.Ct. at 1898.

The Court also clarified that the government must meet its burden with a properly supported historical justification, rather than abstract principles. This historical tradition is primarily discerned through historical regulation itself—a law must be "'relevantly similar' to laws that our tradition is understood to permit." *Id*. (emphasis added).

Importantly, the Court rejected the government's argument that the Second Amendment's plain text only protects "law-abiding, responsible citizens." Brief for the United States at 11–12, *United States v. Rahimi*, 144 S.Ct. 1889, No. 22-915 (U.S. Aug. 14, 2023). Thus, *Rahimi* could not "be disarmed simply because he is not 'responsible'":

> Finally, in holding that Section 922(g)(8) is constitutional as applied to Rahimi, we reject the Government's contention that Rahimi may be disarmed simply because he is not "responsible." "Responsible" is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law. In Heller and Bruen, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

*Rahimi*, 144 S.Ct. at 1903 (internal citations omitted); *see also id*. at 1944 (Thomas, J. dissenting) ("[The Government] argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory … The Government's argument lacks any basis in our precedents[.]").

In so holding, *Rahimi* thus completely undermined *Gay's* contention that a person with a certain number of felony convictions or on parole is not "responsible" and lacks Second Amendment rights. Subsequently, in *United States v. Seiwert*, 152 F.4th 854, 862 (7th Cir. Sept. 12, 2025), the Seventh Circuit acknowledged that "in *Rahimi*, the Supreme Court eyed [the government's argument limiting 'the people'] with much skepticism… and rebuffed the government's reading of *Bruen* and *Heller*." (internal citations omitted). As a result, *Gay* does not survive *Rahimi*.

**C. The Current Circuit Split**

In the wake of *Rahimi*, numerous circuit courts have considered facial and as-applied challenges to Section 922(g)(1). Thus far, the Seventh Circuit has yet to definitively resolve a facial or an as-applied challenge post-*Bruen*. As noted above, however, it assumed without deciding that there is some room for an as-applied challenge in *Gay* and *Prince*, No. 23-3155, which advanced a facial challenge, is pending. The Third Circuit has held that § 922(g)(1) is unconstitutional as applied to a felon who was convicted of making a false statement to secure food stamps. *See Range v. Att'y Gen.*, 124 F.4th 218, 222–23 (3d Cir. 2024) (en banc). Two circuits have rejected individual as-applied challenges but have left open the possibility that § 922(g)(1) might be unconstitutional as applied to at least some felons. *See United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024) (rejecting an as-applied challenge because the defendant's underlying felony was sufficiently similar to a death-eligible felony at the founding); *United States v. Williams*, 113 F.4th 637, 661–62 (6th Cir. 2024) (rejecting an as-applied challenge because the defendant's criminal record sufficiently showed that he was dangerous enough to warrant disarmament). Six circuits have upheld the categorical application of § 922(g)(1) to all felons. *See Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025);

*United States v. Hunt*, 123 F.4th 697, 707–08 (4th Cir. 2024); *United States v. Jackson*, 110 F.4th 1120, 1129 (8th Cir. 2024); *United States v. Duarte*, 137 F.4th 743, 748 (9th Cir. 2025); *Vincent v. Bondi*, 127 F.4th 1263, 1265–66 (10th Cir. 2025); *United States v. Dubois,* 139 F.4th 887, 893 (11th Cir. 2025).

## II. The plain text of the Second Amendment applies to Mr. Doyle's conduct and protects Mr. Doyle's right to bear arms.

### A. Facial and as-applied challenges

Mr. Doyle contends that § 922(g)(1) is unconstitutional facially because there is no historical tradition of disarming all felons, and as applied to him individually because his felony convictions do not show that he is a current danger to such an extent that our regulatory tradition would have permitted the government to permanently disarm him.

"[T]he distinction between facial and as-applied challenges is not so well defined" but it affects "the breadth of the remedy employed by the Court[.]" *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 331 (2010). For an as-applied challenge, the question is whether a law with some permissible uses "is nonetheless unconstitutional as applied to [the defendant's] activity[.]" *Spence v. Washington*, 418 U.S. 405, 414 (1974). "[F]or reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 485 (1989).

### B. Mr. Doyle has a protected Second Amendment right to bear arms.

The Second Amendment protects "the right of the people to keep and bear Arms[.]" U.S. Const. amend. II. As the Supreme Court has explained, this plain language "guarantee[s] the individual right to possess and carry weapons[.]" *D.C. v. Heller*, 554 U.S. 570, 592 (2008). Supreme Court precedent also indicates that individuals who have prior

felony convictions are part of "the people" protected by the Second Amendment. *See id*. at 580–81.[2] Specifically, in *Heller*, the Supreme Court held that there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id*. at 581 (emphasis added). And while the *Heller* decision also included dicta emphasizing the Second Amendment's protections for "law-abiding, responsible citizens," *id*. at 635, the Seventh Circuit has rejected the notion that this dicta limits the scope of the Second Amendment, *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) and *Seiwert*, 152 F.4th at 862, and the Supreme Court in *Rahimi* similarly rejected it and noted that "[t]he question was simply not presented" in *Heller* or *Bruen*. 144 S.Ct. at 1903.

In *Rahimi*, the Supreme Court clarified that a citizen cannot be "disarmed simply because he is not 'responsible'" because that is a "vague term" and it is "unclear what such a rule would entail." 144 S.Ct. at 1903; *see also id*. at 1910 (Gorsuch, J., concurring) ("Nor do we purport to approve in advance other laws denying firearms on a categorical basis to any group of persons a legislature happens to deem, as the government puts it, 'not responsible.'"), at 1944 (Thomas, J. dissenting) ("[The Government] argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.'

---

[2] *See also Range v. Att'y Gen. United States*, 124 F.4th 218, 228 (3d Cir. 2024); *United States v. Duarte*, 137 F.4th 743, 754–55 (9th Cir. 2025) (same); *United States v. Williams*, ___ F.4th ___, 2024 WL 3912894 (6th Cir. Aug. 23, 2024); *United States v. Diaz*, No. 23-50452, 2024 WL 4223684 (5th Cir. Sept. 18, 2024); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116 (10th Cir. 2024); *Zherka v. Bondi,* 140 F.4th 68, 76–77 (2d Cir. 2025); *United States v. Calhoun*, No. 22-CR-00025, 2024 WL 36977, at *8 (N.D. Ill. Jan. 3, 2024) (Valderrama, J.) (holding "felons are not categorically excluded from the plain textual scope of the Second Amendment."); *United States v. Gates*, No. 22 CR 00397, 2023 WL 5748362, at *5 (N.D. Ill. Sept. 6, 2023) (Chang, J.); *United States v. Bell*, No. 23 CR 311, 2023 WL 8475814, at *1 (N.D. Ill. Dec. 7, 2023) (Alonso, J.); *United States v. Prince*, No. 22 CR 240, 2023 WL 7220127, at *6 (N.D. Ill. Nov. 2, 2023) (Gettleman, J.); *United States v. Neal*, No. 20 CR 335, 2024 WL 833607, at *9 (N.D. Ill. Feb. 7, 2024) (Ellis, J.); *United States v. Johnson*, No. 18 CR 00458, 2023 WL 6690388, at *3 (N.D. Ill. Oct. 12, 2023) (Durkin, J.); *United States v. Washington*, 2023 WL 8258654, at *3–4 (N.D. Ill. Nov. 29, 2023) (Coleman, J.); *United States v. Jackson*, 2023 WL 7160921, at *5–6 (N.D. Ill. Oct. 31, 2023) (Bucklo, J.); *United States v. Head*, No. 23 CR 00450-1, 2024 WL 2292236, at *5- (N.D. Ill. May 21, 2024) (Maldonado, J.); but see *United States v. Hardy*, No. 23 CR 129, 2023 WL 6795591, at *3 (N.D. Ill. Oct. 13, 2023) (Kendall, J.).

Not a single Member of the Court adopts the Government's theory … The Government's argument lacks any basis in our precedents[.]"). Accordingly, *Rahimi* unanimously rejected the "law-abiding, responsible" citizen rule advanced in *Gay*. *Rahimi* instead confirms that the Second Amendment right "belongs to all Americans." *Heller*, 554 U.S. at 581. Consistent with *Rahimi* and *Seiwert*, this Court should find that the Second Amendment extends to all individuals with prior felony records, and to Mr. Doyle individually.

**III. The government cannot carry its burden to establish that § 922(g)(1), facially or as applied to Mr. Doyle, is relevantly similar to any historical regulation.**

The plain text of the Second Amendment covers the conduct criminalized by Section 922(g)(1), and thus the government has the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Specifically, the government must show § 922(g)(1) is "relevantly similar to laws that our tradition is understood to permit," particularly that the "[w]hy and how the regulation burdens the right" are relevantly similar to historical regulations. 144 S.Ct. at 1898.

**A. The historical evidence does not show a tradition of disarming all felons.**

To prevail, the government must "satisfy the demanding standard set forth in *Bruen*." *Atkinson*, 70 F.4th at 1022. The government will be unable to meet this burden because the historical evidence instead shows a lack of a tradition restricting felons from gun ownership. In fact, in the early American republic, there were no laws that prohibited ex-felons from possessing firearms after they had completed their punishment. *See* Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113, 127 (2013) ("the federal felon-firearm prohibition only dates back to 1938 … evidence exists that during the founding era felons were not precluded from firearm possession.");

*Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing … such a ban. But at least thus far, scholars have not been able to identify any such laws."); *Folajtar v. Attorney General of the United States*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting) ("I cannot find, and the majority does not cite, any case or statute from that era that imposed … such bans.").

In *Bruen*, the Supreme Court held that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. And *Rahimi* reaffirmed *Bruen's* "commonplace" analogical reasoning. *Id*. (quoting *Bruen*, 597 U.S. at 28). That is the situation here. Crime and recidivism are general societal problems that have existed throughout history. But American society did not traditionally respond to these problems by barring all felons from possessing guns. The Seventh Circuit has also held, prior to *Atkinson*, that "the historical evidence is inconclusive as to whether felons were categorically excluded from the Second Amendment's scope." *Kanter*, 919 F.3d at 445 (capitalization altered). The evidence is inconclusive at best, which does not meet the standard set forth in *Bruen*. *See* 597 U.S. at 18.

**B. The laws that the government commonly cites as analogous to § 922(g)(1) are not relevantly similar to § 922(g)(1).**

Next, the government cannot show that § 922(g)(1), facially, is consistent with "the principles that underpin our regulatory tradition" because the laws that are commonly cited are not relevantly similar to § 922(g)(1). *Rahimi*, 144 S.Ct. at 1898. Specifically, the "[w]hy

and how [§ 922(g)(1)] burdens the right" is not relevantly similar to the laws commonly cited. *Id*.

The laws commonly cited by the government in support of felon in possession restrictions simply did not impose a comparable burden on Second Amendment rights. English laws disarming Catholics did not "impose a comparable burden on the right of armed self-defense" because, among other things, the laws contained a self-defense exception. *See* Joseph G.S. Greenlee, The *Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). As to colonial-era laws disarming Native Americans and Black people, "[n]either the Indian nor the slave was a citizen of the British colonies and … neither was entitled to the rights of English subjects." *United States v. Jimenez Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022).

The ratifying conventions of Massachusetts, Pennsylvania, and New Hampshire never became law, were not incorporated into the Second Amendment, and were not concerned with people with felony records but instead "threatened violence and the risk of public injury." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). And the laws imposing capital punishment and "civil death" on felons had already become relatively rare by the time the constitution was ratified. *Id*. Then-Judge Barrett exhaustively reviewed historical sources and concluded that "[f]elons serving a term of years did not suffer civil death … Those who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of law." *Id*. at 461.

None of these sources of historical evidence is sufficiently probative to show a longstanding historical tradition of disarming all felons for their natural life. *See Bruen*, 597 U.S. at 18; *Rahimi*, 144 S.Ct. at 1898.

Notably, the "[w]hy and how" of §922(g)(8), upheld in *Rahimi*, is markedly different from that of §922(g)(1). In *Rahimi*, the Supreme Court explained that § 922(g)(8) was constitutional in part because it imposed only temporary disarmament, similar to the historical analogues cited by the government (surety and going armed laws). 602 U.S. at 699. The Supreme Court also relied on the fact that §922(g)(8)'s restriction "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another[.]" *Id.* In other words, a judicial finding that the person represents a current threat to another individual was a necessary piece of the Court's willingness to uphold §922(g)(8). In contrast, §922(g)(1)'s restriction is permanent and applies due to the simple fact of any felony conviction. Section 922(g)(1)'s permanent disarmament without a contemporary adjudication is distinct and applies "to an extent beyond what was done at the founding," *Rahimi*, *id.* at 692, and therefore its burden – the "how" described by *Bruen* and *Rahimi* –is not comparable.

### C. The government cannot meet its burden to show its purported analogues justify the permanent disarmament of Mr. Doyle specifically.

In determining whether Section 922(g)(1) is unconstitutional as it applies to certain categories of offenders, as an initial matter, *Bruen* assigns the historical burden to the government, not to the defendant. 597 U.S. at 19 (government is required to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms"); *Rahimi*, 144 S.Ct. at 1896. In the context of an

as-applied challenge, this means that the government must demonstrate that its historical analogies are relevant even to defendants with a record like Mr. Doyle's.

The government cannot carry their burden with respect to Mr. Doyle. First, colonial era disarmament laws were not about "untrustworthiness" or "danger," but instead targeted minority groups that were politically subjugated or excluded from the rights of citizenship. At most, these laws targeting minority groups were about lessening the specific risk of armed rebellion. Colonial laws prevented enslaved individuals from accessing guns because white colonists feared revolts from the enslaved. *See* Herbert Aptheker, *American Negro Slave Revolts* 18–19 (5th ed. 1987) (citing the "nearly unanimous agreement" among scholars that there was "widespread fear of servile rebellion" throughout the 18th century (footnote omitted)). Laws disarming Native Americans, Catholics, and British loyalists were similarly motivated by colonial fears of insurrection. *See, e.g., Prince*, 2023 WL 7220127, at *7 n.4 (noting that "members of the Native American tribes were considered to be citizens of hostile foreign nations"); Clement Fatovic, *The Anti-Catholic Roots of Liberal and Republican Conceptions of Freedom in English Political Thought*, 66 J. Hist. Ideas 37, 43 (2005) ("throughout the seventeenth century it was widely believed that closet Catholics throughout the country formed a deadly fifth column lying in wait to slaughter Protestants and force their religion on the nation with Catholics"). In other words, each of these laws was justified—not by a risk of illegal activity in general—but based on a specific nexus to forceful, violent conduct in rebellion of the government. The government has offered no evidence that these laws apply to someone like Mr. Doyle, who has no history of political violence or insurrection.

Each one of these regulations contained carve-outs to allow individuals to possess guns. As other courts have noted, anti-Catholic gun regulations nevertheless "allowed Catholics to obtain permission to possess firearms for self-defense" by going to a magistrate. *Calhoun*, 2024 WL 36977, at *11. The same was true for the few laws that prevented Native Americans from owning firearms. *See* 2 Records of the Colony of Rhode Island and Providence Plantations 561 (1857) (1677 R.I. law) (allowing Native Americans to possess firearms based on a "ticket or order" authorizing such possession). Even the laws governing the enslaved contained carveouts that authorized enslaved individuals to carry firearms under certain circumstances. And the laws disarming British loyalists were subject to the oath-taking exception, and individuals could acquire new arms without even taking the oath. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & Hist. Rev. 139, 157 (2007). So—to the extent that those historical laws could be framed as categorical exclusions based on danger—those exclusions were not absolute. Individualized exceptions were allowed despite some general prohibitions on firearm possession. That history indicates that as-applied challenges to Section 922(g)(1) should be allowed to go forward.

In determining whether the government has proven that Section 922(g)(1) is constitutional as applied to Mr. Doyle, only Mr. Doyle's felony convictions are relevant. Section 922(g)(1) purports to disarm Mr. Doyle because he "has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year[.]" 18 U.S.C. § 922(g)(1). If Mr. Doyle convictions do not demonstrate a history of conduct analogous to that which motivated colonial era gun regulations, and are not recent enough that the

regulations would apply to the conduct, then Section 922(g)(1) does not constitutionally apply to Mr. Doyle.

According to the pretrial services report, Mr. Doyle has sustained felony convictions. *See* Doc. 8 at 4–6. Those convictions, however, are decades old and do not support permanent disarmament. *Id*. For those individuals who were disarmed for political violence or forfeited their firearms for committing certain offenses, American history demonstrates that those disarmaments were not permanent. The founding-era governments allowed a felon to "'repurchase arms' after successfully completing his sentence and reintegrating into society." *Range*, 69 F.4th at 105. Felons could serve in the militia, own firearms, regain their ability to have their arms after being traitors to our nation. Mr. Doyle has discharged the sentences he has been required to serve. Indeed, it has been nearly 20 years since he has sustained any type of conviction at all, and the parole for his last (non-violent drug possession) conviction was discharged nearly 15 years ago. There is no historical tradition of continuing to disarm individuals for the entirety of their lives without a contemporary adjudication of dangerousness. The burden § 922(g)(1) imposes on those it regulates is therefore not comparable to the alleged historical analogues. Section 922(g)(1) is thus unconstitutional.

## CONCLUSION

For the reasons stated above, the Court should find that Section 922(g)(1) is unconstitutional facially and as applied to Mr. Doyle and grant his motion to dismiss Counts Two through Four.

Dated: October 20, 2025

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By: */s/ Amanda G. Penabad*
Amanda G. Penabad
*Attorney for Melvin Doyle*

AMANDA G. PENBAD
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8340